**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| PIPER JAFFRAY, INC.<br>a Delaware Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. N18C-04-021 EMD CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MARRONE BIO INNOVATIONS, INC., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted:  August 17, 2018
Decided:  November 28, 2018

*Upon Defendant's Motion to Dismiss,*

**DENIED**.

Eric Lopez Schnabel, Esquire, Alessandra Glorioso, Esquire, Dorsey & Whitney (Delaware) LLP, Wilmington, Delaware, Thomas P. Swigert, Esquire, Of Counsel (pro hac vice), Phil Steger, Esquire, Of Counsel (pro hac vice), Dorsey & Whitney LLP, Minneapolis, MN, Attorneys for Plaintiff Piper Jaffray, Inc.

Elena C. Norman, Esquire, Benjamin M. Potts, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Judson E. Lobdell, Esquire, Of Counsel (pro hac vice), Morrison & Foerster LLP, San Francisco, CA, Attorneys for Defendants Marrone Bio Innovations, Inc.

**DAVIS, J.**

## I.     INTRODUCTION

This is a breach of contract action assigned to the Complex Commercial Litigation Division of the Court.  Plaintiff Piper Jaffray Inc., an investment banking firm ("Piper Jaffray"), has brought suit against Defendant Marrone Bio Innovations, Inc. ("Marrone Bio") for payment of a Transaction Fee (defined below).  Piper Jaffray contends that it is owed the Transaction Fee

under the terms of an engagement letter, dated January 7, 2017, as amended (the "Engagement Letter"),[1] in connection with a private placement that Marrone Bio completed on February 6, 2018.

On April 3, 2018, Piper Jaffray brought this cause of action against Marrone Bio for breach of contract seeking damages in excess of $2 million dollars. On May 24, 2018, Marrone Bio filed a Motion to Dismiss for failure to state a claim pursuant to Superior Court Rule 12(b)(6) (the "Motion to Dismiss"). For the following reasons set forth below, the Court **DENIES** the Motion to Dismiss.

## II.      FACTUAL BACKGROUND[2]

### A.      Parties, Jurisdiction and Choice of Law

Piper Jaffray is an international investment bank and asset management firm. Piper Jaffray is incorporated in the State of Delaware.[3] Its principal place of business is in Minneapolis, Minnesota.[4]

Marrone Bio is a Delaware corporation with its principal place of business in Davis, California.[5] Marrone Bio produces bio-based pest management and plant health products for agricultural and water markets in both the U.S. and internationally.[6] It is publicly traded on NASDAQ.[7]

---

[1] The parties amended the Engagement Letter on February 15, 2017 and June 29, 2017, respectively.
[2] While the vast majority of the facts have been taken directly from the Complaint ("Compl."), certain facts have been clarified from a review of Marrone Bio's public filings, which were incorporated by reference into the Complaint.
[3] Compl. ¶ 1.
[4] *Id.*
[5] Compl. ¶ 2
[6] *Id.*
[7] *Id.*

The Engagement Letter provides that it "will be governed by and construed in accordance with the laws of Delaware, without regard to [Delaware's] conflict of law principles."[8] In addition, the parties have waived their right to a jury trial in connection with any disputes arising out of the Engagement Letter.[9]

### B.     Engagement of Piper Jaffray and NSC

Marrone Bio completed its initial public offering in August of 2013.[10] Marrone Bio completed a secondary offering in June 2014 based on Marrone Bio's performance in 2013 and the first quarter of 2014.[11] After the secondary offering, the FBI and the SEC began an investigation of Marrone Bio's financials and its executives for securities fraud.[12] In addition, stockholders filed a related stockholder class action lawsuit.[13] In 2016, Marrone Bio paid a $1.75 million fine to the SEC and settled the class action suit for $12 million.[14] As a result of the foregoing, Marrone Bio's ability to continue as a going concern was in jeopardy and it was in need of additional financing.[15]

On January 7, 2017, Piper Jaffray and Marrone Bio entered into the Engagement Letter under which Piper Jaffray agreed to provide investment banking services to Marrone Bio to facilitate a transaction for the benefit of Marrone Bio.[16] These services included, among other things, (i) assessing Marrone Bio's business operations, (ii) identifying and contacting potential purchasers, (iii) preparing a memorandum regarding Marrone Bio's operations and financials to present to potential purchasers, (iv) analyzing proposals received from potential purchasers and

---

[8] Compl. Ex. A.
[9] *Id.*
[10] Compl. ¶ 7.
[11] *Id.*
[12] Compl. ¶ ¶ 7, 8.
[13] *Id.*
[14] Compl. ¶ 8.
[15] Compl. ¶ ¶ 8, 9.
[16] Compl. ¶ ¶ 10, 11.

3

(v) assisting in negotiations with potential purchasers.[17]  In exchange for Piper Jaffray's services, Marrone Bio agreed to pay Piper Jaffray: (a) a retainer in the amount of $150,000 (to be credited against any Transaction Fee described below); (b) reasonable out-of-pocket expenses not to exceed $50,000; (c) a fairness opinion fee, if requested; and (d) a Transaction Fee upon consummation of a transaction.[18]

After the engagement, Piper Jaffray performed substantial work in 2017 at Marrone Bio's request.[19]  Piper Jaffray (i) prepared detailed analysis and valuations of Marrone Bio (including an analysis of whether Marrone Bio should remain a public company), (ii) prepared and presented strategic alternatives for financing to Marrone Bio's Board of Directors and its executives, (iii) identified and negotiated with potential purchasers of Marrone Bio, (iv) coordinated due diligence with prospective purchasers, and (v) advised Marrone Bio and its Board of Directors throughout the process.[20]  Piper Jaffray's efforts resulted in the execution of thirteen non-disclosure agreements and written proposals from two potential strategic buyers.[21]

In August 2017, Marrone Bio engaged an additional financial advisor, National Securities Corporation (NSC"), to assist Marrone Bio with identifying potential transactions.[22]  At that time, the retention of Piper Jaffray remained in effect.[23]

---

[17]  Compl. ¶ 11.
[18]  Compl. ¶ 12.
[19]  Compl. ¶ 17.
[20]  *Id*.
[21]  *Id.*
[22]  Compl. ¶ 18.
[23]  *Id.*  The retention of Piper Jaffray by the Company was a non-exclusive engagement.  In that regard, the Engagement Letter specifically provides that "[t]he Company may engage one or more other financial advisors, in addition to us [Piper Jaffray], to act as co-advisor, as deemed necessary by the Company, it being understood that any such retention of another financial advisor shall not affect our rights hereunder (including with respect to its entitlement to a Transaction Fee) or the Company's obligations hereunder." Engagement Letter @ 4. (Exhibit A to the Compl.)

### C. Marrone Bio Obtains Bridge Financing and Subsequently Consummates a Private Placement

After the engagement of NSC, Marrone Bio began discussions with a group of investors led by Dwight Anderson, the principal of Ospraie Ag Sciences LLC ("Ospraie").[24] On October 12, 2017, a member of Marrone Bio's Board of Directors sent an email to Tom Halverson, the lead banker from Piper Jaffray on the Marrone Bio engagement that provided:

> Pam sent you a voicemail regarding a $1 million bridge loan from Ospraie. That is correct. However, I would not communicate that to Valagro [a strategic buyer] until we see a firm term sheet which we should get today. Leaves all options open in my opinion.[25]

In an 8-K filed on October 18, 2017, Marrone Bio announced that it had entered into a bridge loan with Mr. Anderson on October 12, 2017, the terms of which provided for a $1 million unsecured promissory note with a three-year term at an interest rate of 1% per annum through December 31, 2017 (the "Bridge Loan").[26] The terms of the Bridge Loan also granted Mr. Anderson the option to convert any or all of the outstanding principal and interest on the Bridge Loan into Marrone Bio common stock.[27] Shortly thereafter, on October 24, 2017, Marrone Bio publicly announced in an 8-K that it had amended the Bridge Loan on October 23, 2017 to increase the loan amount up to $6 million.[28] The other terms of the Bridge Loan remained the same.[29]

---

[24] Compl. ¶ 19.
[25] Compl. ¶ 20.
[26] Compl. ¶ 21. Beginning on January 1, 2018, the promissory note would bear an interest rate of 10% per annum.
[27] *Id.*
[28] Compl. ¶ 22.
[29] *Id.*

On the day the 8-K was filed, Marrone Bio gave Piper Jaffray notice of its election to terminate the Engagement Letter.[30] In accordance with the 10-day notice requirement set forth in the Engagement Letter, the effective date of termination was November 3, 2017.[31]

On December 18, 2017, Marrone Bio announced through another 8-K that it had entered into a securities purchase agreement (the "Purchase Agreement") with a group of investors led by Ospraie.[32] Under the Purchase Agreement, the investors agreed to purchase an aggregate of 44,00,001 units (the "Units"), with each Unit purchased by Ospraie consisting of one share of Marrone Bio common stock and one warrant to purchase one share of Marrone Bio common stock and each Unit purchased by the other investors consisting of one share of Marrone Bio common stock and one warrant to purchase 0.8 shares of Marrone Bio common stock.[33] The aggregate purchase price under the Purchase Agreement was $30 million.[34] The Purchase Agreement provided that the aggregate purchase price was inclusive of funds being advanced by Mr. Anderson under the Bridge Loan. The 8-K further explained that, concurrent with entry into the Purchase Agreement,[35] Marrone Bio had amended certain debt obligations with two other of its creditors (not Ospraie) pursuant to which the creditors would also convert $45 million in aggregate principal amount of debt into shares of Marrone Bio common stock conditioned upon the closing of the Purchase Agreement.[36]

---

[30] Compl. ¶ 23.
[31] *Id.*
[32] Compl. ¶ 24.
[33] *Id.*
[34] *Id.*
[35] *Id.* The 8-k explained that Anderson had already funded $3.5 million under the "Ospraie Note," which together with the additional $2.5 million he had yet to fund would convert into Units at closing.
[36] *Id.*

On December 20, 2017, Piper Jaffray advised Marrone Bio that the series of related transactions announced by Marrone Bio constituted a Transaction under the Engagement Letter and, as a result, Piper Jaffray was entitled to a Transaction Fee upon closing.[37]

On December 22, 2017, Marrone Bio and Mr. Anderson entered into another amendment to the Bridge Loan on largely the same terms as the initial Bridge Loan, except that Mr. Anderson was now taking a security interest in Marrone Bio's property.[38] On January 3, 2018, Marrone Bio filed a definitive proxy statement with the SEC seeking, among other things, stockholder approval of the issuance of Marrone Bio's common stock and warrants to purchase common stock in connection with the private placement and debt refinancings. The total number of shares of Marrone Bio common stock issued at closing was 71,012,286, which represented approximately 69% of Marrone Bio's total issued and outstanding shares.[39] On February 6, 2018, Marrone Bio announced that it had closed the transaction with Ospraie.[40]

### D.     Specific Terms of the Engagement Letter at Issue

As previous noted, the sole issue before the Court is whether the private placement consummated by Marrone Bio in February 2018 constitutes a Transaction under the Engagement Letter. If it does, Piper Jaffray contends it is entitled to the Transaction Fee. As such, the dispute turns on the facts of this case and the interpretation of the defined terms "Transaction" and "Transaction Fee" as set forth in the Engagement Letter.

Under the terms of the Engagement Letter, "Transaction" means:

> any transaction or series or combination of related transactions whereby, directly or indirectly, by merger, plan of exchange, sale, consolidation, recapitalization or otherwise 50% or more of the Company's capital stock (based on shares outstanding), or all or substantially all of the assets of the

---

[37] Compl. ¶ 25.
[38] Compl. ¶ 26.
[39] Compl. ¶ 27.
[40] Compl. ¶ 28.

Company['s assets][sic] (based on book value) is transferred or exchanged by you [Marrone Bio] and/or your shareholders.[41]

The term "Transaction Fee," provides, in pertinent part, as follows:

[i]n the event you [Marrone Bio] consummate a Transaction pursuant to a definitive agreement or written commitment entered into (i) during the term of this agreement, (ii) with (A) an Identified Party,[42] (B) any other party with whom you have had contact regarding a Transaction during the term of this agreement or (C) any other party with whom the Company consummates a Transaction after the Company has executed a definitive agreement regarding a Transaction during the term of this agreement or (ii) during the 9-month period following the termination of this agreement, with an Identified Party . . . a cash fee, payable at closing of the Transaction (the "Transaction Fee"), equal to the greater of (x) $2.0 million or (y) an amount determined as follows . . . .[43]

### III.    STANDARD OF REVIEW

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must "view the complaint in the light most favorable to the non-moving party, accepting as true all well pleaded allegations and drawing reasonable inferences that logically flow from them," but "decline . . . to accept conclusory allegations unsupported by specific facts or to draw unreasonable inferences in favor of the non-moving party."[44]  "Even vague allegations are considered well-pleaded if they give the opposing party notice of a claim."[45]

"Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[46]  But, if the Court engages the

---

[41]  Compl. ¶ 14.  Engagement Letter @ 1.
[42]  Neither Anderson nor Ospraie are Identified Parties under the Engagement Letter.
[43]  Engagement Letter @ 2.
[44]  *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).
[45]  *Veney v. United Bank*, 2017 WL 3822657, at *2 (Del. Super. Ct. Aug. 31, 2017).
[46]  *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004).

standards described and finds the claimant may recover, the Court must deny the motion to dismiss.[47]

## IV. DISCUSSION

To prevail on a claim for breach of contract, the plaintiff must show: (1) the existence of a contract between the parties; (2) the defendant breached an obligation owed to plaintiff under the contract; and (3) the breach resulted in damages.[48] Piper Jaffray and Marrone Bio do not dispute the existence of the Engagement Letter, but rather whether or not there has been a breach by Marrone Bio under that agreement.

When reviewing contracts, courts generally give priority to the parties' intentions contained in the four corners of the contract.[49] "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[50] "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[51] "When construing a contract, and unless a contrary intent appears, [courts] will give words their ordinary meaning."[52]

Where the language of the contract is plain and unambiguous, the contract must be enforced as written.[53] "If a writing is plain and clear on its face, i.e. its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[54] The parole evidence rule bars the admission of evidence outside the contract's four

---

[47] *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004924, at *3 (Del. Super. Ct. August 17, 2015); *Spence v. Funk & Commc'n Consultants, Inc.*, 396 A.2d 967, 968 (Del. 1978).
[48] *See VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).
[49] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).
[50] *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (1985).
[51] *Riverbend Community, LLC v. Green Stone Engr., LLC*, 55 A.3d 330, 334 (Del. 2012) (citing *GMG Capital*, 36 A.3d at 779).
[52] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992).
[53] *Lorillard Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 740 (Del. 2006).
[54] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

corners to vary or contradict the unambiguous language.[55]  However, "where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence.[56]

Marrone Bio contends that the private placement does not constitute a Transaction under the plain meaning of the terms of the Engagement Letter.  Marrone Bio argues that if the private placement does not constitute a Transaction then Piper Jaffray is not entitled to a Transaction Fee.  Marrone Bio claims that the definition of Transaction under the Engagement Letter requires a "transfer" or "exchange" of shares of Marrone Bio and that the private placement is neither. According to Marrone Bio, the plain meaning of the terms "transfer" and "exchange" require that its shares move from one party's possession to another party's possession.[57]

Marrone Bio provides that the private placement is an "issuance" of new shares of Marrone Bio, and that the failure to use that term in the Engagement Letter underscores the parties clear intent that Piper Jaffray was to be compensated under the Engagement Letter for facilitating a *sale of the company*, rather than the *financing* that occurred.  Marrone Bio further contends that Piper Jaffray could have negotiated the definition of Transaction to include a financing, but it failed to do so.[58]

---

[55] *GMG Capital*, 36 A.3d 776 at 783.

[56] *Id.*

[57] Defs. Br. in Supp. of the Mot. to Dismiss the Compl. at. 11 (hereinafter "Defs Br."); Marrone Bio cites the dictionary meanings of the terms "transfer" and "exchange" to supports its reading of the Engagement Letter. (*See* Black's Law Dictionary (10th Ed.2014) (to "transfer" means to "convey or remove *from* one place or one person *to* another: to pass or hand over *from* one *to* another, esp. *to change over the possession or control of*) (emphasis added); Webster's Third New International Dictionary, Unabridged (2018) (to "exchange" means "to part with, give, or transfer in consideration of something received as equivalent").

[58] *See Bain Capital, Inc. v. Wesley Jessen Corp.*, 2003 WL 21129854, *4 (Mass. Super. Apr. 16, 2003)(discussing an engagement agreement in which a transaction fee would be owed "in connection with the consummation of each acquisition, divestiture, or financing . . . ").

Marrone Bio also claims that the Complaint should be dismissed on independent grounds because it fails to allege facts showing that Marrone Bio had entered into a "written commitment" to proceed with the private placement as of the effective date of the termination of the Engagement Letter—*i.e.*, November 3, 2017 or the "Effective Date." In support, Marrone Bio asserts that it cannot be reasonably inferred that a written commitment to enter into the private placement existed prior to the Effective Date solely on the basis of (i) the existence of the Bridge Loan and its terms, (ii) the language used in the Company's public filings regarding the private placement, (iii) the email correspondence between the Marrone Bio Board and Piper Jaffray or (iv) the timing of the Company's termination of the Engagement Letter.

In opposing the Motion to Dismiss, Piper Jaffray argues that the private placement fits squarely within the definition of Transaction set forth in the Engagement Letter because (i) the private placement resulted in a change in control of Marrone Bio, which is the type of transaction that Piper Jaffray was to facilitate,[59] and (ii) that the Engagement Letter intentionally uses the broadest possible language to describe a change in control transaction.[60] Piper Jaffray goes on to contend that the private placement fits within any common or technical understanding of the word "sale," which term was specifically used in the definition of Transaction, and is further supported by the language used in the Purchase Agreement.[61] Piper Jaffray then claims that the Purchase Agreement speaks in "sale" terms with its use of the defined term "Buyer" and the statement that "[Marrone Bio] shall issue *and sell* to each Buyer, and each Buyer . . . agrees to *purchase* from the Company . . . Common Shares."[62]

---

[59] Pl.'s Br. in Opp. to the Mot. of Def. to Dismiss the Compl., at 1. (hereinafter "Pl's Opp. Br.")
[60] Pl. Opp. Br. at 12.
[61] *Id.* at 1-2.
[62] Purchase Agreement @ 1 (Ex. A to Aff. Of Thomas P. Swigert).

11

Piper Jaffray also contends that it has adequately alleged and pled sufficient facts, on information and belief, to demonstrate that Marrone Bio entered into a "written commitment" prior to the termination of the Engagement Letter.[63]  Piper Jaffray argues that, as stated in the Complaint, its efforts resulted in two written proposals from strategic buyers, at least one of which was still negotiating with the Company as of the date when Marrone Bio entered into the Bridge Loan with Anderson.[64]  Piper Jaffray points to the email from the Marrone Bio Board member and the reference to a "term sheet" as support for the notion that a written commitment existed at that time.  Piper Jaffray further pleads that the day after the Bridge Loan was amended to increase the loan amount, Marrone Bio sent notice to Piper Jaffray that it was terminating the Engagement Letter.  According to Piper Jaffray, this sequence of events—coupled with the reference to a "term sheet" and the terms of the Bridge Loan itself—support Piper Jaffray's allegation that Marrone Bio had entered into a commitment with respect to the private placement when Marrone Bio terminated the Engagement Letter.

In applying the applicable standard of review and drawing all reasonable references in favor of Piper Jaffray, the Court finds that Marrone Bio has failed to demonstrate that under no reasonable interpretation of the facts alleged does the Complaint fail to state a claim upon which relief might be granted.  Piper Jaffray has alleged sufficient facts to put Marrone Bio on notice of its claims for breach of contract. The Court will not dismiss them at this stage of the proceedings.

In terms of whether Marrone Bio had entered into a "written commitment" to sell itself prior to termination of the Engagement Letter, this Court can reasonable infer from the facts, as

---

[63] *McDermott v. Clondalkin Grp., Inc.* 649 F. App'x 263, 267 (3d Cir. 2016) ("where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, so long as there are no 'boilerplate and conclusory allegations' and '[p]laintiffs . . . accompany their legal theory with factual allegations that make their theoretically viable claim plausible.")
[64]  Compl. ¶ 20 and Ex. B.

pled, that a written commitment existed as of November 3, 2017—the Effective Date. Piper Jaffray alleges that, on October 12, 2017, Marrone Bio entered into a $1 million Bridge Loan with Ospraie under terms that were well below market. Initially, the Bridge Loan was unsecured for a three-year term at an interest rate of 1% per annum through December 31, 2017. On October 23, 2017, the Bridge Loan was increased to $6 million, but all of the other terms of the Bridge Loan remained the same. Given the below market rate of the Bridge Loan, it is reasonably conceivable that the initial Bridge Loan and subsequent amendment thereto were part of a series of transactions which resulted in the transaction Marrone Bio ultimately consummated with Ospraie. For Ospraie to lend money to Marrone Bio on such terms does not, at this stage of the proceeding, otherwise make any logical business sense. Moreover, the Purchase Agreement and Marrone Bio's public filings specifically refer to and incorporate the Bridge Loan, supporting the inference that the Bridge Loan was part of the Ospraie transaction.

Given that the Bridge Loan appears to have been part of Marrone Bio's overall transaction with Ospraie, the unresolved factual question remains as to whether Marrone Bio had a "written commitment" to enter into the Ospraie transaction prior to termination of the Engagement Letter. In its pleadings, Piper Jaffray references a term sheet Marrone Bio anticipated receiving from Ospraie on October 17, 2017. Whether that terms sheet was received by Marrone Bio and would constitute a "written commitment" as contemplated by the Engagement Letter, or whether there are other documents that would constitute such a written commitment remains a question of fact at this stage of the proceedings. But, in reviewing the Complaint in the light most favorable to Piper Jaffray, it is reasonable for the Court to infer from the facts pled that such a written commitment existed prior to termination of the Engagement Letter. Focused discovery by the parties should quickly resolve this factual issue.

13

In denying the Motion to Dismiss, the Court is not concluding at this stage of the proceedings that the terms of the Engagement Letter are ambiguous, but rather that factual questions remain.   The Court may ultimately determine that the transaction the Company entered into with Ospraie does not constitute a Transaction to which Piper Jaffray is entitled to a Transaction Fee under the terms of the Engagement Letter.  That issue is not appropriately decided on a motion to dismiss.  Discovery may shed considerable light on the facts in this case and may make a determination by the Court on summary judgment more likely.

## V.    CONCLUSION

For the reasons set forth above, the Court **DENIES** the Motion to Dismiss.

**IT IS SO ORDERED**

*/s/ Eric M. Davis*
**Eric M. Davis, Judge**

cc:    File&ServeXpress

14